OVERTON, 3.
 

 The present case is one in wliieh plaintiff sues for $8,754.75 for the breach of an alleged verbal contract to give them the exclusive agency to sell certain property in Vincennes place, belonging to defendant, and, in the alternative, to recover this amount, for services performed, on a quantum meruit.
 

 It is urged that the contract wa~ breached by defendant's insisting that the written contract, whieh the agreement contemplated, should contain three conditions, which were not in the verbal contract, and which were inconsistent with it, and, if incorporated, would furnish the means of practically destroying the verbal agreement and overthrowing its purpose.
 

 These conditions were: (1) That the right to sell the lots would not be exclusive for the period verbally agreed upon, namely, for the period of two years from the completion of the contemplated improvements to the subdivision; (2) that defendant would have the right to increase the minimum prices by giving plaintiffs ten days notice; and (3) that defendant would have the right to exclude from his ~vroposed authority to sell, at any time before the sale thereof by plaintiffs, any lots which defendant desired to improve by erecting thereon buildings or other improvements, provided that, if and when such lots and buildings were sold, petitioners would `be paid a commission on the vacant grounds at contract prices then prevailing.
 

 The amount sued for is based on a commission of 5 per cent. of the alleged value of the property affected, which is said and conceded to be not less than $175,095.
 

 Plaintiffs, who are real estate agents, for some time had in contemplation, which was
 
 *883
 
 finally consummated, the formation of a subdivision out of squares 112, 113, 114, 115, 116, and 117, located near State street drive, on the right upper side' of Fontainebleau drive, in the city of New Orleans, and owned by different persons, but it was not until 1925, when square 112 was acquired by Dr. Wolfe, that anything could be accomplished by plaintiffs.
 

 When the development seemed to be possible, square 112 was owned by Dr. Wolfe, squares 113, 114, and 115 were owned by defendant, and squares 116 and 117 were the property of Mr.- Montegut. Wolfe’s square faced on the recently opened Fontainebleau drive, known before it was fully opened as Baldwin street, defendant’s squares were to the rear of Wolfe’s square, and Montegut’s to the rear of defendant’s. Uthoff, from the beginning, appeared to have favored the formation of the subdivision, with the end in view of putting the lots, to be laid out, on the market by the owner of the particular square to be subdivided into lots.
 

 The consent of all owners had to be obtained to the formation of the subdivision; arrangements had to be. made, which proved difficult, for desirable ingress and egress to and from the property; more particularly to and from the rear squares.
 

 These arrangements were finally made, after many conferences among the property owners and after some of the means proposed of obtaining access to the squares had been rejected, by an agreement to lay out and construct a street through the property and to close' certain blind ends of intersecting streets. To accomplish this, not only was it necessary to obtain the approval of the three owners of the squares to the plan, but it was also necessary (the plan involving the closing of certain ends of streets, and the laying out of a street) to obtain the consent of the authorities of the city of New Orleans. This consent was obtained after a number of conferences was held. As a result of closing the ends of streets, defendant gained two lots, valued at $8,000.
 

 In the construction of the plan to create the subdivision, plaintiffs, through one of the members of their firm, Myles Kernaghan, were the leading figures in forming the subdivision. The forming of it was their conception. They were largely instrumental in carrying out the plan, including the laying of sidewalks and pavement on the newly laid out street, as also the making of arrangements for supplying the subdivision with electricity and the like, and the preparing of building restrictions.
 

 When everything was in readiness to place the lots on the market, plaintiffs prepared and presented to defendant a written contract, giving them, for a period of two years from the date
 
 of
 
 the completion of the improvements to the subdivision, such as the laying of sidewalks and pavement, the exclusive agency to sell the property belonging to defendant in the subdivision. Defendant refused to sign the contract, unless the word “exclusive” was stricken from it, and unless the contract presented was modified in accordance with the remaining objections stated in the first part of this opinion; namely, to permit him to increase the minimum prices, if the market value of property in the locality rose, and to exclude from the authority to sell such lots as defendant desired to improve, upon condition that, if the lots and improvements were sold, plaintiffs would be paid a commission on the vacant lots at contract
 
 *885
 
 prices then prevailing. Plaintiffs would not yield to defendant’s demand to strike the word “exclusive” from the contract, nor to the remaining objections of defendant.
 

 The rock on which plaintiffs and defendant really split was that of exclusive agency; or, at least, that was the paramount objection raised to the contract presented by plaintiffs for signature.
 

 Plaintiffs have no written contract. They therefore rest their right to recover, as relates to their action for breach of contract, on a verbal contract, worked out from understandings had at various conferences held during the progress of the formation of the subdivision, supported by clauses contained in contracts submitted for signature, but not signed at all, or not signed by both of the parties litigant, but stressed, because both parties submitted contracts for signature, containing, in some instances, similar clauses, thus giving rise, it is urged, to the inference that such clauses were agreeable to both parties and, in other instances, clauses apparently approved by only one side.
 

 Kernaghan, a member of plaintiffs’ firm, testified that there was a verbal agreement to give plaintiffs the'agency, but he distinctly says that the word “exclusive” was not used in the conversations had. He testified thus:
 

 “Q. Now, Mr. Kernaghan, the allegation to the effect that you (meaning his firm) had an oral agreement for an exclusive contract of agency is not correct, is it? A. No, we never did define that we would be the sole and exclusive agents.
 

 “Q. You never had an oral agreement to the effect you would be exclusive agents? A. I don’t think that such was touched on.
 

 “Q. You never had an agreement to that effect? A. No.”
 

 The evidence of Mr. Theard, the engineer on the work, who attended many of the conferences held, shows that the words “exclusive agency,” so far as his knowledge extended, were not used in the conversations had, but that he gained the impression that plaintiffs were appointed “the agents.”
 

 Without going further into detail, the evidence we think establishes that there was a verbal agreement that plaintiffs should be defendant’s agents, or brokers, in the sale of the property, on a commission of 5 per cent., and that there was a minimum price list submitted for the lots that was agreeable to both sides.
 

 While there is no evidence of a verbal agreement, showing, at least, an express grant of an exclusive agency, plaintiffs’ contention is that the nature and amount of the work done by them in forming the subdivision, together with certain expressions and clauses in one or more of the contracts submitted for signature, show that an exclusive agency was contemplated by both sides throughout the performance of the preparatory work, and that such may be said to have been impliedly agreed to.
 

 One of the clauses referred to is contained in a contract submitted to the parties in interest, and signed on September 5, 1925, by Dr. E. J. Wolfe, one of the property owners, which defendant, on September 11, 1925, in an instrument, signed by him alone, agreed ■ to, with a proviso showing an exception as to the payment of a certain amount to Dr. Wolfe, and also showing defendant’s insistence that a clause be inserted giving him the
 
 *887
 
 right to exclude four lots, belonging to him, from the agency to be given plaintiffs. The clause, so far as pertinent, which defendant was willing to agree to, reads as follows:
 

 “It is agreed by Dr. Wolfe that W. G. Moran will act as his selling agent, and by Mr. Henry Uthoff (defendant) and Mr. H. L. Montegut that Kernaghan & Cordill (plaintiffs) will act as their selling agents. The said before selling agents’ agreements to hold good foi; two years from the time the improvements are completed, if all sites are not sold before that time.”
 

 Another provision upon which plaintiffs rely, in part, to show the granting of an exclusive agency, is contained in the document, signed by defendant on September 11, 1923, setting forth his objections to the proposed contract of September 5, 1925, is one reading as follows:
 

 “The said Uthoff and associates agree to enter into a contract with Kernaghan & Cord-ill to act as selling agents in the subdivision of land of said Uthoff and associates, the fee of Kernaghan & Cordill is fixed at
 
 5%'.
 
 gross on
 
 all sales.
 
 The said Uthoff reserves four 50 foot sites.” (Italics supplied.)
 

 A contract listing property for sale will not be construed to be exclusive, unless the right be granted expressly or by clear implication. Walker on Real Estate Agency, p. 13; 9 C. J. p. 623, § 101, title “Brokers”; 4 R. C. L. p. 259, § 12, title “Brokers”; Harris & White v. Stone, 137 Ark. 23, 207 S. W. 443; Cook v. Forst, 116 Ala. 395, 22 So. 540; White v. Benton, 121 Iowa, 354, 96 N. W. S76; Talbot v. Mattox, Dawson
 
 &
 
 Posey Realty Co., 26 Okl. 298, 109 P. 128; McFadden v. Crisler, 141 Tenn. 531, 213 S. W. 912.
 

 While the work done by plaintiffs in forming the subdivision and the resulting benefits derived therefrom by defendant might seem to be a sufficient inducement to grant plaintiffs an exclusive agency, yet, apparently, it did not seem so to defendant. This circumstance does not of itself, though it possesses strong equities, justify the inference that an exclusive agency was actually granted. Defendant perhaps felt that it was contrary to his interest to tie up irrevocably his property for a period of two years by granting such an agency, and that it would meet all proper requirements for him merely to give an agency, not exclusive, to plaintiffs, and to continue, in his discretion, to permit them to procure purchasers within that period, and, so long as plaintiffs gave satisfaction, not to list the property with other’s in conjunction with them. Be that as it may, the circumstance is not sufficient to justify the inference of a grant of exclusive agency, for the right to such agency does not arise clearly, or unequivocally, from it. Nor does the circumstance mentioned, when construed in connection with those clauses of the proposed contracts, quoted above, show that the agency was to have been exclusive.
 

 The clause in the proposed contract of September 5,1925, reciting, in substance, that it is agreed that plaintiffs will be defendant's selling agent, does not mean that the agency agreed to is exclusive, nor does it even suggest that it is such. The same is virtually true as to the clause in the document signed by defendant on September 11, 1925, setting forth his objections to the proposed contract of September 5, 1925, reciting that the fee of plaintiffs “is fixed at
 
 5%
 
 gross on all sales.” The expression “on all sales” means, as here
 
 *889
 
 used, on all sales made by plaintiffs. This would seem to follow from the failure even to mention in the conversations had the exclusiveness of the agency, and from the law that the agency, to be exclusive, must be so declared by the contract, or else its exclusiveness must arise clearly or unequivocally by implication. No inference of exclusive agency arises from the fact that because defendant, in his proposed modification of the contract submitted for signature, desired a clause inserted, reserving to him the right to reserve four 50-foot lots. The right to reserve such lots cannot be construed as granting an exclusive agency to sell the remainder. It likewise does not follow, we think, that an exclusive agency was granted, because defendant in an unsigned document submitted to plaintiffs, but rejected by them, inserted a provision, stressed by the court below, to the effect that, in addition to the reservation of the foregoing lots, he reserved the right to exclude from the agreement, at any time before a sale thereof should be made by plaintiffs, any additional lots, in order to improve them, with the proviso that, when he sold the lots so withdrawn, he would allow plaintiffs their commission on the vacant lots, at prices then prevailing. This was merely a clause in an unaccepted contract, intended to provide for the right, notwithstanding the granting of the nonexclusive agency for a period of two years, to withdraw lots at any time during that period for purpose of improvement ; plaintiffs, in return for the waiver of the two-year period as to these lots, to be paid as if they had as to them not merely an exclusive agency, but an exclusive right to sell.
 

 It must be borne in mind, in reading the foregoing, that the provisions therein mentioned are merely excerpts from unaccepted contracts, the only possible value of which is to throw some light on whether or not a complete verbal contract was entered into granting an exclusive agency, for admittedly there was no written contract entered into granting such agency. To say the least, this character of evidence should be considered with great caution, for it too often occurs that provisions are inserted in proposed contracts, not because there was any verbal agreement including them, but because they were prompted by other considerations, which are acceptable provided the whole is accepted.
 

 Our conclusion is that it does not appear that an exclusive agency was granted. Hence plaintiffs had no right to insist upon the signing of a contract expressly granting such agency, which they did, as a condition to their proceeding further. Hence, this insistence being a cause, in fact, the chief cause, of the severance of relations between the parties, plaintiffs cannot recover on a contract basis.
 

 With reference to their demand on a quantum meruit, it well may be that plaintiffs are entitled to compensation for services actually performed and accepted by defendant; •but, after reading the record, we fail to find the value of the services rendered established. True, there is the evidence of an expert showing that 5 per cent, of the value of the property would be the minimum compensation, and 10 per cent, a fair compensation, but this includes, if it does not wholly rest upon, the making of sales, and no sales, save a minor one not involved, were made by
 
 *891
 
 plaintiffs or through their agency. As to this demand, we think that the case should he remanded for the introduction of further evidence and for final disposition.
 

 The trial judge rendered judgment for plaintiffs for the full amount of their claim; the judge finding that an exclusive agency had been granted.
 

 The judgment is set aside, plaintiffs’ demand, based on a contract, is rejected, and plaintiffs’ demand, based on a quantum meruit, is remanded to the lower court for the reception of further evidence thereon, and for disposition according to law; plaintiffs to pay the costs of this appeal, and the costs of the trial below on the contract demand; the remaining costs to abide the final decision of the case.